NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 190646-U

NOS. 4-19-0646, 4-19-0647 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 13, 2020
Carla Bender
4th District Appellate
Court, IL

| | |
|---|---|
| *In re* J.R. and E.S., Minors<br><br>(The People of the State of Illinois,<br>　　　　Petitioner-Appellee,<br>　　　v.　(No. 4-19-0646)<br>Chelsea D.,<br>　　　　Respondent-Appellant).<br>-------------------------------------------------------------------<br>*In re* J.R. and E.S., Minors<br><br>(The People of the State of Illinois,<br>　　　　Petitioner-Appellee,<br>　　　v.　(No. 4-19-0647)<br>Christopher S.,<br>　　　　Respondent-Appellant). | ）<br>）　Appeal from<br>）　Circuit Court of<br>）　Champaign County<br>）　No. 15JA30<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>）　Honorable<br>）　Brett N. Olmstead,<br>）　Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices DeArmond and Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed the trial court's judgment finding respondents unfit and terminating their parental rights.

¶ 2    Respondent mother, Chelsea D., and respondent father, Christopher S., are the parents of E.S. (born on May 11, 2015). Respondent mother is also the parent of J.R. (born August 26, 2008). J.R.'s father is Steven R., who is not a party to this appeal. In May 2019, the trial court found respondents were unfit parents. In August 2019, after a best-interest hearing, the court terminated respondents' parental rights.

¶ 3 Respondents appeal separately, arguing (1) the trial court's finding them to be unfit parents was against the manifest weight of the evidence and (2) the court's decision to terminate their parental rights was against the manifest weight of the evidence. We consolidated the appeals and now affirm the court's judgment.

¶ 4                                  I. BACKGROUND

¶ 5 In May 2015, the State filed a petition for adjudication of wardship, alleging E.S. and J.R. were neglected minors in that their environment was injurious to their welfare when residing with respondents because they were exposed to domestic violence (count I) and substance abuse, namely alcohol abuse (count II).

¶ 6 In January 2016, respondents admitted and stipulated to the allegations in count I and the trial court dismissed count II. Without objection, the court considered several police reports as the factual basis for the admissions. The police reports documented three domestic-violence incidents between respondents during September 2014, May 2015, and August 2015. The court accepted the admissions and stipulations and found the minors neglected.

¶ 7 The Illinois Department of Children and Family Services (DCFS) opened an intact case allowing respondent mother to retain custody of the minors. She and E.S. resided with her maternal grandmother in Savoy, while J.R. resided at the Illinois School for the Deaf in Jacksonville. Respondent father had been arrested during the May 2015 and August 2015 domestic-violence incidences, at a time when he was on probation for other criminal charges. He was sent to prison and was scheduled for release in February 2016.

¶ 8 In February 2016, the trial court conducted a dispositional hearing and found (1) respondents were unfit and unable, for reasons other than financial circumstances alone, to care for, protect, train, or discipline the minors and (2) it was in the minors' best interests that they be

made wards of the court and adjudged neglected. However, the court allowed custody of the minors to continue with  respondent mother.

¶ 9 Respondent father was released from prison in July 2016. He resided with his mother in Oakwood and began participating in recommended domestic-violence and substance-abuse services. By December 2016, respondent mother had successfully completed a domestic-violence program and was engaged in her recommended level one outpatient substance-abuse treatment program. In a February 2017 permanency order, the trial court found respondents had both made reasonable efforts and progress toward the return of the minors under the applicable standard for permanency orders. In fact, in May 2017, guardianship and custody of J.R. was restored to respondent mother and the minor's wardship was terminated.

¶ 10 However, by August 2017, respondent father was not participating in his services and had been diagnosed with bipolar and anxiety disorders. He was unsuccessfully discharged from treatment. During the summer of 2017, respondent mother relapsed and was required to re-engage in treatment. As of November 2017, respondent mother had a few more weeks of treatment remaining. DCFS wanted to have her successfully complete this treatment before guardianship and custody of E.S. was restored to her. In January 2018, respondent mother was successfully discharged from treatment at Rosecrance.

¶ 11 Also, in January 2018, five days after her successful discharge, respondent mother was involved in a car accident at a time when she was under the influence of Xanax. In February 2018, the trial court found (1) respondent unable, for reasons other than financial circumstances alone, to care for protect, train, or discipline E.S. and (2) that E.S.'s health, safety, and best interest would be jeopardized if he remained in respondent mother's custody. The court removed custody

of E.S. from respondent mother and placed the same with DCFS. E.S. continued to reside with respondent mother's maternal grandmother, and respondent mother lived elsewhere.

¶ 12　　　　In January 2019, the State filed a motion for termination of parental rights. The charges against the respondents were the same and alleged each parent was unfit for the following reasons: (1) they failed to make reasonable progress toward the return of the minor during any nine-month period following the adjudication of neglect, namely April 4, 2018, through January 4, 2019 (750 ILCS 50/1(D)(m)(ii) (West 2018)) and (2) they failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (750 ILCS 50/1(D)(b) (West 2018)).

¶ 13　　　　Over the course of four hearing dates between March and May 2019, the trial court conducted the fitness portion of the termination hearing. First to testify for the State was Evanne Astell, a probation officer in Vermilion County who supervised respondent mother's probation out of Champaign County from July 2018 until November 2018. Astell requested two random drug screens: July 25, 2018, and August 21, 2018. Respondent mother refused the first and tested negative on the second. However, she admitted using marijuana on July 20, 2018, and methamphetamine on August 18, 2018, August 23, 2018, and November 8, 2018.

¶ 14　　　　Courtney Kingsmill testified that she was respondent mother's mental-health therapist at Crosspoint Human Services in Danville. They were scheduled to first meet in October 2018 but, by December 2018, after only two sessions and four no-shows, respondent mother was unsuccessfully terminated for nonattendance. Respondent mother informed Kingsmill she was moving to Champaign so Kingsmill provided a referral to Rosecrance in Champaign.

¶ 15　　　　Debra Saunders, a counselor at Rosecrance in Danville, testified she performed respondent mother's substance-abuse assessment in April 2018. Respondent mother was referred to outpatient treatment which she began in May 2018. By June 26, 2018, she was unsuccessfully

discharged for lack of engagement and lack of attendance. Respondent mother re-engaged on July 26, 2018, but attended only four sessions before her file was closed in November 2018. At that time, respondent mother withdrew, stating she was moving to Champaign. Respondent mother confessed to Saunders that she had used methamphetamine in October 2018.

¶ 16    Diana Hightower, respondent father's substance-abuse counselor at Rosecrance, testified she first met him in February 2018 and worked with him until July 2018 at the level two intensive outpatient treatment. He was unsuccessfully discharged for nonattendance. He was re-assessed in August 2018 and was recommended for inpatient treatment, which he began but left after two days. Respondent father reported to Hightower that he successfully completed residential treatment at Haymarket in Chicago in January 2019, and he was re-referred to her for level two intensive outpatient treatment thereafter. In January and February 2019, respondent father tested negative for substances.

¶ 17    Dr. Hayng Sung Yang, respondent mother's treating psychiatrist, testified he had met with her three times: December 16, 2018, January 2, 2019, and February 14, 2019. Although she complained of depression and anxiety, Dr. Yang diagnosed her with bipolar disorder and prescribed Depakote, a mood stabilizer. By their second meeting on January 2, 2019, both Yang and respondent mother noted improvements in her mood. However, at the February 14, 2019, meeting, Dr. Yang learned respondent mother was not taking Depakote as directed. He said he had to "restart the medicine" but he was not sure whether she took it as directed.

¶ 18    Jonathan Willenborg, the DCFS caseworker from May 2017 to November 2018, testified respondent mother's service plan required her to participate in substance-abuse treatment, individual counseling, parenting, visitation, and random drug screens. She had successfully completed domestic-violence treatment at Rosecrance. Willenborg said respondent mother had

been referred to substance-abuse treatment as of April 4, 2018, but as of November 2018, she had not completed it. Willenborg said visits were not a concern but he would not consider increasing the frequency or length of the visits or making them unsupervised until he saw progress in respondent mother's substance-abuse treatment.

¶ 19 Willenborg testified respondent father's service plan required that he participate in substance-abuse treatment, visitation, parenting, domestic-violence treatment, and individual counseling. Respondent father had maintained stable housing by residing with his mother. He completed domestic-violence treatment prior to April 2018. He exercised his visitation without incident. Willenborg said he wanted to see respondent father make progress in his substance-abuse treatment before visitation could be increased or unsupervised.

¶ 20 Lisa Barkstall, the DCFS caseworker who succeeded Willenborg in November 2018, testified she was the caseworker for only 27 days until Lutheran Social Services of Illinois (LSSI) assumed the case. All referrals were in place for both respondent parents.

¶ 21 Janessa Hays, the LSSI caseworker beginning on November 30, 2018, testified that respondent mother was reportedly participating in substance-abuse treatment and individual counseling at Rosecrance in Danville. She was living in a women's shelter in Danville. However, in December 2018, respondent mother moved into her grandmother's residence in Savoy.

¶ 22 Hays said respondent mother missed two visits with E.S. during the week of December 13, 2018. Hays learned that at respondent mother's visit on January 3, 2019, she appeared to be under the influence of an unknown substance based upon her unusual behavior, slurred speech, and unsteadiness.

¶ 23    Hays said respondent father successfully completed substance-abuse treatment in January 2019 at Haymarket residential treatment but he was required to continue treatment at Rosecrance in Danville. Respondent father's visits with E.S. were satisfactory.

¶ 24    Tanya Grey, a case aide at LSSI, testified she supervised visits for respondents beginning in December 2018. She recalled respondent mother's bizarre behavior during the visit on January 3, 2019. Respondent mother was 30 minutes late for the visit. Grey then described her as unusually drowsy, not engaged in the visit, speaking incoherently, and engaging in overall confusing behavior.

¶ 25    At the close of this evidence, the State rested. The trial court took judicial notice "of all orders entered in this case and all petitions or motions upon which those orders were based."

¶ 26    Respondent father called his sister, Amber S., as a witness. She testified she believed respondent father was doing everything he could for E.S. Amber knew respondent father was participating in services because she often drove him to his appointments.

¶ 27    Laura Perry, respondent father's mother, testified she believed respondent father's attitude had improved throughout the case. The last time she saw respondent father under the influence of drugs or alcohol was in October or November 2018. He was engaged in group counseling and enjoyed his visits with E.S. Perry said respondent mother resided in the home a few months earlier but had moved out because of arguments with respondent father.

¶ 28    Respondent mother called Sandra Davis as a witness. Davis was respondent mother's care coordinator for the domestic-violence program at Crosspoint. She said respondent mother moved into the shelter on November 9, 2018, and moved out on December 15, 2018. When the case was transferred from DCFS to LSSI in November 2018, respondent mother became

depressed because she had lost her transportation service. Although she described her as "depressed," Davis had no concern about respondent mother's mental health.

¶ 29 Janice D., respondent mother's mother, testified she became E.S.'s foster mother as of November 30, 2018. When respondent mother left the shelter, she moved in with her grandmother and continued to improve. Janice had no concerns about respondent mother caring for E.S. She said she had not seen respondent mother under the influence of drugs or alcohol for eight years.

¶ 30 Barbara Bender, respondent mother's grandmother, testified she was E.S.'s foster parent from February 2018 until December 2018. She believed respondent mother could properly care for E.S., as she had not seen respondent mother under the influence of alcohol or drugs since she moved into her home.

¶ 31 Lacey Fairley, a family services specialist for Addus, supervised respondents' visits with E.S. between February 2018 and May 2018. She said visits were generally good. She said, "there were several days where mom and dad were not getting along, and that always made for a rough visit because *** it was hard for them to work together for [E.S.]."

¶ 32 Respondent mother testified that as of April 2018, she was not engaged in services. She said she was on a waiting list at Gateway and Chestnut for both mental-health and substance-abuse treatment. She said she participated in a substance-abuse assessment at Rosecrance in May 2018 but it was recommended she wait until she was released from her 30-day jail sentence before beginning treatment. Respondent mother stated she pleaded guilty in Moultrie County to driving on a revoked license (her driver's license was revoked as a result of her 2015 driving-under-the-influence conviction). She agreed to a 30-day sentence beginning on June 4, 2018. After her release on July 3, 2018, respondent mother participated in another assessment and was referred to

intensive outpatient treatment. She engaged in treatment until November 2018 when she lost her transportation service. She said she moved in with respondent father's mother in Oakwood in early December 2018. On December 6, 2018, she attempted suicide by intentionally overdosing on Trazodone after fighting with respondent father. On December 15, 2018, she moved in with her grandmother, and on December 18, 2018, Rosecrance referred her to Dr. Yang for a psychiatric evaluation. She admitted she continued to abuse drugs between April 4, 2018, and January 4, 2019, occasionally with respondent father.

¶ 33        Cody Floyd, a Champaign County Sheriff's deputy, testified he was dispatched to LSSI on January 3, 2019, to arrest respondent mother on an outstanding Moultrie County warrant. (This was when the case aide described respondent mother's behavior as bizarre during her visit.) According to Floyd, respondent mother did not appear to be under the influence of drugs or alcohol.

¶ 34        Over respondent mother's objection, the trial court admitted certified copies of the Moultrie County records into evidence. Respondent mother rested her case.

¶ 35        In rebuttal, the State re-called Hays as a witness. She testified she provided respondent mother with bus tickets beginning on November 30, 2018, for transportation to services and visits.

¶ 36        After considering the evidence and recommendations of counsel, the trial court found the State had not sufficiently proved respondents were unfit parents for their failure to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare. However, the court found the State had sufficiently proved respondents were unfit parents for their failure to make reasonable progress toward the return of the minor to their care during the nine-month period of April 4, 2018, to January 4, 2019. Specifically, the court noted the objective

standard which applied to the relevant inquiry and not the "parents' particular circumstances and challenges and obstacles, difficulties they have that are unique to them."

¶ 37 With regard to respondent mother, the trial court found the period of April 4, 2018, to January 4, 2019, "was a period for [her] of constant unsuccessful struggle with substance abuse. She admitted using marijuana in July, methamphetamine in August, methamphetamine again in August, methamphetamine in October, methamphetamine in November, *** there were other instances of use of illegal substances and use of prescribed substances improperly. It was going on throughout that time period."

¶ 38 With regard to respondent father, the trial court found that during the period of April 4, 2018, to January 4, 2019, he "maintained consistent communication with [DCFS], and at the same time, maintained consistent noninvolvement in substance-abuse treatment." The court noted respondent father "first addressed it seriously as a problem in his life in December 2018. That was eight months into that nine-month clock, and it kept tick, tick, ticking."

¶ 39 On August 30, 2019, the trial court conducted the best-interest hearing. Respondent mother testified she was released from Moultrie County jail on August 2, 2019, after being taken into custody on two probation violations, namely (1) missing October 2018 appointments with her probation officer and (2) signing admissions of drug use in 2018. However, she said she had maintained her sobriety since being released from custody and she wanted to enter residential treatment. She also said she had resumed her mental-health treatment with Dr. Yang. She expressed her desire to not "be away from [E.S.]," as he motivates her to continue with her services.

¶ 40 After considering this evidence, LSSI's best-interest report, and the statutory factors, the trial court found it to be in the minor's best interests that respondents' parental rights

- 10 -

be terminated. On August 30, 2019, the court entered a written order terminating respondents' parental rights.

¶ 41    These consolidated appeals followed.

¶ 42                    II. ANALYSIS

¶ 43    Respondents appeal, arguing (1) the trial court's finding each to be an unfit parent was against the manifest weight of the evidence and (2) the court's decision to terminate their parental rights was against the manifest weight of the evidence. We disagree and affirm.

¶ 44                    A. Unfitness Finding

¶ 45    Respondent mother claims the State failed to prove DCFS and/or LSSI made reasonable efforts to provide her the necessary services. Specifically, she argues that had she engaged in psychiatric mental-health treatment earlier in the case, she would have been successful in completing her required tasks. It was not until her suicide attempt in December 2018 that her mental health arose as an identifiable issue that needed to be medically addressed. Dr. Yang diagnosed respondent mother with bipolar disorder and prescribed medication. Respondent mother and Dr. Yang both testified the medication, Depakote, helped stabilize her mood within a short time. However, evidence further revealed she continued to display substance-abuse issues thereafter.

¶ 46    Because termination of parental rights is a serious matter, the State must prove unfitness by clear and convincing evidence. *In re M.H.*, 196 Ill. 2d 356, 365 (2001). "A determination of parental unfitness involves factual findings and credibility assessments that the trial court is in the best position to make." *In re Tiffany M.*, 353 Ill. App. 3d 883, 889-90 (2004). A reviewing court accords great deference to a trial court's finding of parental unfitness, and such

a finding will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re T.A.*, 359 Ill. App. 3d 953, 960 (2005).

¶ 47    If the trial court finds the State has carried its burden of proof as to parental fitness, we do not reweigh the evidence, but instead we decide whether those findings are against the manifest weight of the evidence. *In re R.L.*, 352 Ill. App. 3d 985, 998 (2004). A finding of unfitness is against the manifest weight of the evidence only if it is "clearly apparent" that the State failed to prove, by clear and convincing evidence, that the respondent was an unfit person. *In re Adoption of C.A.P.*, 373 Ill. App. 3d 423, 427 (2007).

¶ 48    The trial court addressed respondent mother's claim during its pronouncement at the fitness hearing, finding there was never a time in the case that DCFS "hadn't made reasonable efforts[.]" Instead, the court found DCFS "can only do so much to help a person." Respondent mother has a responsibility to make reasonable progress. Her argument that she would have made reasonable progress had she treated with Dr. Yang earlier is not consistent with evidence of her ongoing substance abuse. The testimony related to her behavior on January 3, 2019, indicated that she was, as the court stated, "under the influence of something. *** [Respondent mother] was high, extremely high on something." This incident occurred after she had been taking her mood stabilizer. The failure to have her mental health evaluated prior to December 2018 "does not shield the actions of [respondent mother] from scrutiny." "When official action frustrates parental efforts, their fitness will be judged by actions which show their intent, rather than by their ultimate success." *In re S.B.*, 348 Ill. App. 3d 61, 67 (2004).

¶ 49    Respondent mother's mental health was not the sole condition at issue for her. After successfully addressing the domestic-violence issue, she was to work toward eliminating E.S.'s exposure to substance abuse and correcting her pattern of substance abuse. With the substance-

- 12 -

abuse goal at the forefront, she can frame no reasonable argument that taking Depakote any earlier in the case would have eradicated her substance-abuse problem. Moreover, the evidence of her behavior at the January 3, 2019, visitation is an example that completely rebuts her argument. At that time, she was presumably taking Depakote and under the care of her psychiatrist. Respondent mother's failure to make reasonable progress toward sobriety during the applicable nine-month period was apparent and independent of her mental-health issues. Based on the evidence of record, we find the trial court's finding respondent mother was unfit is not against the manifest weight of the evidence.

¶ 50　　　　　Likewise, respondent father failed to address his substance-abuse issues during the relevant nine-month period of April 4, 2018, to January 4, 2019. During that time, he was discharged from treatment for lack of participation and attendance and then a month later, he walked out of inpatient treatment after two days. He acknowledged that he needed inpatient treatment, but he simply did not want to do it. As the trial court noted, respondent father attended an "unspecified, undeveloped in evidence inpatient treatment program at a place called Haymarket in Chicago in [December 2018]." However, he needed further treatment beyond that. Respondent father did not begin to seriously address his substance abuse until December 2018, at the end of the applicable nine-month period.

¶ 51　　　　　"Reasonable progress" has been defined as "demonstrable movement toward the goal of reunification." (Internal quotation marks omitted.) *In re C.N.*, 196 Ill. 2d 181, 211 (2001). During the relevant time period, respondent father did not make demonstrable movement toward sobriety. As such, he was not able to meet minimal parenting standards of being drug free to have E.S. returned to his care anytime in the near future. Again, based on the evidence of record, we

find the trial court's unfitness finding as to respondent father is not against the manifest weight of the evidence.

¶ 52                                    B. Best-Interest Finding

¶ 53        Respondents each assert the trial court's finding it was in the minor's best interest to terminate his parental rights was against the manifest weight of the evidence. The State disagrees.

¶ 54        At the best-interest stage, a "parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The State must prove by a preponderance of the evidence termination is in the child's best interests. *Id.* at 367. This court will not reverse a trial court's finding termination of parental rights is in a minor's best interests unless it is against the manifest weight of the evidence. *In re Anaya J.G.*, 403 Ill. App. 3d 875, 883 (2010). A finding is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *Id.*

¶ 55        The evidence presented at the best-interest hearing demonstrated that E.S. was in a loving and stable home with his maternal grandmother. She was willing to establish permanency through his adoption. As the trial court found, E.S. deserves this stability as his parents continuously failed to address their ongoing substance abuse. Given the evidence and recommendations presented, the trial court's finding it was in the minor's best interest to terminate respondents' parental rights was not against the manifest weight of the evidence.

¶ 56                                    III. CONCLUSION

¶ 57        For the reasons stated, we affirm the trial court's judgment in these consolidated appeals.

¶ 58        No. 4-19-0646: Affirmed.

- 14 -

¶ 59        No. 4-19-0647: Affirmed.